# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
NOV 09 2020
SEAN F. McAVOY, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

ESTATE OF GREGORY V. FAULL,

Plaintiff,

v.

JOHN MCAFEE,

Defendant.

Case No:  6:13-cv-1746-Orl-31LRH

2:20-MC-00039-SAB

## AMENDED[1] MEMORANDUM OPINION AND ORDER

This matter comes before the Court after a bench trial held on January 10, 2019 regarding the Plaintiff's claim for damages. After considering the pleadings, evidence, argument, and relevant legal authority, and having made determinations as to the credibility of the witnesses, the Court hereby renders its decision pursuant to Federal Rule of Civil Procedure 52.

### I. Procedural History

The Estate of Gregory Faull (henceforth, the "Estate") initiated this wrongful death action against the Defendant, John McAfee ("McAfee") on November 8, 2013.[2] (Doc. 1). McAfee was served with a copy of the Amended Complaint (Doc. 12) on December 4, 2014. (Doc. 39 at 3).

---

[1] Amended to include date of signing, which was inadvertently deleted from previous order.

[2] The personal representative of the Estate is Curt Jacobus, who was appointed via letters of administration issued by the probate division of the Circuit Court for Brevard County, Florida, on October 8, 2013. (Doc. 57 at 22).

I CERTIFY THE FOREGOING TO BE A TRUE
AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY: _____
DEPUTY CLERK

On May 28, 2016, he was served with a copy of the Second Amended Complaint (Doc. 57). (Doc. 78).

On January 12, 2017, the Court denied the Estate's motion for default judgment in regard to the Second Amended Complaint and denied, as futile, the Estate's motion for leave to file the Third Amended Complaint. (Doc. 90). On appeal, however, the United States Court of Appeals for the Eleventh Circuit reversed the denial of leave to amend and remanded the case, finding that the allegations of the proposed complaint "plausibly state a wrongful death claim against McAfee under Florida law for the death of Faull." (Doc. 100 at 4).

The Third Amended Complaint (Doc. 104), which is the operative pleading, was provided to McAfee on May 7, 2018. (Doc. 107). As with the previous pleadings, McAfee never answered the Third Amended Complaint or otherwise made an appearance in the case.

On November 14, 2018, pursuant to the Estate's motion (Doc. 113), the Court approved the entry of default judgment as to liability against McAfee in regard to the Third Amended Complaint. (Doc. 119). Because the amount of damages was not specified in that pleading, the Court approved the Estate's request for an evidentiary hearing on that issue. *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1543-44 (11th Cir. 1985) (holding that "a judgment of default awarding cash damages could not properly be entered without a hearing, unless the amount claimed is a liquidated sum or one capable of mathematical calculation.") (quotation and citation omitted).

II.  **Jurisdiction**

The Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are diverse. At the time of his death, Gregory Faull ("Faull") was domiciled in Florida (Doc. 104 at 1), and therefore pursuant to 28 U.S.C. § 1332(c)(2), the Estate is deemed to be a citizen of

Florida. As of the filing of this action, McAfee – who moves around frequently – was a citizen of a state other than Florida. (Doc. 104 at 4). The amount in controversy in this matter exceeds $75,000.

### III.  Findings of Fact

In November 2012, Gregory Faull was living on the beach on Ambergris Caye, a remote and sparsely populated island in Belize. (Doc. 104 at 21). The 52-year-old Faull, a retired general contractor and restauranteur, had temporarily relocated to Belize from Florida (Doc. 104 at 1-2) in the wake of a divorce earlier that year.

On the evening of November 10, 2012, Faull attended a party at the home of two neighbors, Shane and Brittany McCann. (Doc. 104 at 7). There were no roads along that stretch of Ambergris Caye; anyone wishing to travel through that area had to use the beach or take a boat. (Tr. at 34).[3] Faull walked to and from the party along the beach. (Doc. 104 at 8).

As he did so, he would have passed in front of the home of John McAfee, the defendant in this matter. (Doc. 104 at 8). McAfee developed some of the earliest commercial antivirus software; the company bearing his name was later sold to Intel Corporation for an enormous sum. McAfee lived about 200 yards down the beach from Faull, between his house and the McCann's. (Doc. 104 at 2-3, 33).

\* \* \*

McAfee had developed a certain notoriety among the residents of Ambergris Caye. For purposes of security or intimidation or both, he employed a number of armed guards. The guards

---

[3] References to the transcript of the bench trial (Doc. 136) are in the format "Tr." at "page number".

- 3 -

patrolled McAfee's property and the beach in front of it, carrying automatic weapons, shining spotlights on people walking by at night, and looking "violent and dangerous," according to Faull's neighbor and good friend, Jeffrey Spiegel. (Doc. 134-72 at 2).[4] McAfee bragged that a number of his guards had served time in prison. (Doc. 104 at 5). Neighbors and tourists told Spiegel that they felt threatened by the guards and by the eight to twelve dogs McAfee kept on his property. (Doc. 104 at 2-3, 6). Spiegel testified that the dogs, which were untrained and would "bark incessantly all night," would sometimes get outside McAfee's fence and attack people walking down the beach. (Doc. 104 at 6). Spiegel said he was one of the people who was bitten. (Doc. 134-72 at 2).

Faull and McAfee were not on good terms. (Doc. 134-72 at 3). According to Spiegel, McAfee's dogs got loose and attacked Faull at least once. (Doc. 134-72 at 3). Faull complained about the dogs directly to McAfee, and to the local authorities, such as the Town Board of the local municipality, San Pedro, and to the equivalent of the local humane society. (Doc. 134-72 at 6, Tr. at 35-36). When those efforts were unsuccessful, Spiegel testified, Faull took matters into his own hands; on November 9, 2011, he poisoned two of McAfee's dogs. (Tr. at 36). When McAfee discovered what had happened, he became irate, euthanizing the dogs with multiple gunshots (Doc. 104 at 7) and, in Spiegel's words, "parading up and down the beach, screaming," alarming his neighbors (Tr. at 37).

\* \* \*

---

[4] In addition to testifying via Skype at the evidentiary hearing, Spiegel provided a written declaration (Doc. 134-72). The Court also received into evidence declarations from two members of the Belize Police Department, Mark Humes (Doc. 134-78) and Hilberto Romero (Doc. 134-79). Pursuant to 28 U.S.C. § 1746, such declarations, when made under penalty of perjury, may be used as evidentiary support in the same manner as a sworn affidavit. All three of these declarations were made under penalty of perjury in substantially the form set forth at 28 U.S.C. § 1746(1).

In its Third Amended Complaint, the Estate alleged that after discovering the poisoning, McAfee had an associate, Cassian Chavarria ("Chavarria"), deposit $5,000 in the account of a local "violent male," Eddie McKoy ("McKoy") to pay for the murder of Gregory Faull. (Doc. 104 at 16). The Estate further alleged that in the early morning hours of November 11, a female associate of McAfee's appeared at Faull's home to provide a distraction, allowing McKoy to subdue, torture, and murder Faull. (Doc. 104 at 16). Shortly thereafter, Chavarria received a phone call from McKoy, asking to be picked up from a spot about 600 feet from Faull's house. (Doc. 104 at 17). Because McAfee failed to respond to the Third Amended Complaint, those allegations, along with the other well-pleaded allegations of fact from that pleading, are accepted as true. *See, e.g., Lary v. Trinity Physician Financial & Ins. Svcs.*, 780 F.3d 1101, 1106 (11th Cir. 2015).

* * *

Faull returned from the McCann's party on the evening of November 10, the day after the poisoning. (Doc. 104 at 8). The next morning, Spiegel received a phone call, notifying him that Faull had been found dead. (Tr. at 38). He immediately took his boat to Faull's house, where he found Faull's body in a pool of blood in the living room. (Doc. 134-72 at 3). The only other person at the house was Faull's housekeeper, who had discovered the body. (Doc. 134-72 at 3).

Faull lay on his back, in front of the television, which was still on. (Tr. at 41, 39). He had been shot once, in the back of the head. (Tr. at 41). There were no signs of a struggle, such as knocked-over furniture. (Tr. at 41). Faull appeared, in Spiegel's words, to "simply [have been] executed." (Tr. at 41).

The police arrived twenty or thirty minutes after Spiegel. (Tr. at 40). During that time, Spiegel testified, "[p]retty much the entire neighborhood" congregated on Faull's veranda or front

yard after hearing the news about Faull. (Tr. at 40). There was, however, one notable exception: McAfee. (Tr. at 40). Spiegel confirmed that McAfee was nearby that morning. At one point after the police arrived, Spiegel had to return to his house. Rather than taking his boat, he ran back up the beach, which took him past McAfee's property. (Tr. at 40). He saw McAfee sitting in a lounge chair by his pool, "watching the goings-on unfold" and looking "relaxed." (Tr. at 40). Spiegel said he was surprised and a little bit concerned that, unlike other members of the community, who were horrified or at least disturbed by Faull's death, McAfee displayed no shock or even curiosity. (Tr. at 40-41).

Hilberto Romero, Superintendent of Police of the Belize Police Department, subsequently inspected Faull's body and confirmed the gunshot wound that Spiegel had noticed. (Doc. 134-79 at 1). In addition, Romero observed part of a human fingernail in Faull's scalp, and "various markings on his torso and genitals that are consistent with burns caused by a Taser."[5] (Doc. 134-79 at 1). Romero concluded that one or more assailants had subdued Faull with a Taser and then shot him. (Doc. 134-79 at 1).[6]

Spiegel testified that he – along with, he believed, the rest of his neighborhood – immediately concluded that McAfee had been responsible for Faull's death. (Tr. at 43). McAfee was declared a person of interest by the police the next day. (Tr. at 43). Beginning on

---

[5] Witnesses had previously reported seeing McAfee use a Taser to discipline his dogs, on several occasions. (Doc. 104 at 11). In addition, McAfee supplied his guards with Tasers. (Doc. 104 at 5). Spiegel said McAfee himself sometimes carried a Taser (or a cattle prod, or a handgun) when walking the beach or visiting a bar on Ambergris Caye. (Doc. 134-72 at 2).

[6] In addition to the declaration provided by Romero, the Court received into evidence declarations from Mark Humes of the Belize Police Department (Doc. 134-78) and from Faull's friend and neighbor, Jeffrey Spiegel (Doc. 134-72). Pursuant to 28 U.S.C. § 1746, such declarations, when made under penalty of perjury, may be used as evidentiary support in the same manner as a sworn affidavit. All three declarations were made under penalty of perjury in substantially the form set forth at 28 U.S.C. § 1746(1).

November 11, police made multiple attempts to find and question McAfee, but McAfee evaded them. (Doc. 104 at 11-12). In December 2012, he crossed the border illegally into Guatemala. (Doc. 104 at 14). From there, he returned to the United States. (Doc. 104 at 15). He has never submitted to questioning by the Belize police regarding Faull's murder.

* * *

The record in this case establishes that Faull was, in many ways, a remarkable man who enjoyed a vigorous lifestyle. Raised in Florida, he enjoyed boating and fishing throughout his life. He obtained a captain's license from the Coast Guard and operated his own charter boat. (Tr. at 123). After high school, he became a carpenter, then got his contracting license and built a very successful business, Gregory V. Faull General Contractors, Inc., doing work at, among other places, Walt Disney World and Universal Studios, and on Red Lobster restaurants. (Tr. at 64, 86, 123-24). He raced motorcycles and enjoyed driving fast cars. (Tr. at 69). Later in life, he got into the restaurant business after spotting a vacant building on the campus of the University of Central Florida that he thought would be a good spot for a sports bar and restaurant. (Tr. at 124). His establishment, Tailgaters, opened in 2008 and was still operating at the time of his death; his former wife, Vickie, ran it while he was in Belize. (Tr. at 125-27).

The testimony at trial showed that he was in good health (Tr. at 57) and that he had a number of close relatives who lived past the age of 80, including his 82-year-old mother, Eileen Kenney, who testified at the bench trial. (Tr. at 46-67). Also still alive at that time were his 86-year-old father, an 87-year-old maternal aunt, and a paternal aunt in her mid-90s. (Tr. at 47-49).

According to data compiled by the Centers for Disease Control, the average 52-year-old white male has a life expectancy of 28.2 additional years. (Doc. 134-47 at 1). The available evidence suggests that Faull would have been expected to live at least that much longer.

Shortly before his death, Faull told Roger Helms – another good friend and Florida resident – that he was hoping to return to Florida because he wanted to get back together with his ex-wife and to foster a stronger relationship with his daughter, Amber Eileen. (Tr. at 81). He planned to sell the house in Belize, which he estimated was worth $1 million to $1.5 million, and use the proceeds to re-establish his contracting business. (Tr. at 81-82).

* * *

Amber Eileen was 26 years old and in her first semester at college in Georgia when her father was killed. She said they had a "special bond" and were like "buddies". (Tr. at 165). She testified that, even when she was very young, she and her father both loved the outdoors and spent a lot of time doing things together outside, such as fishing and camping. (Tr. at 143-44). The music he loved when she was a child became her favorite music. (Tr. at 165). He collected vinyl albums, and on one of his last visits to her in college, he gave his collection to her because he knew she would appreciate it. (Tr. at 165). She continues to do things to honor his memory; at her college graduation party, for example, she set aside an empty chair along with a candle and a picture of the two of them together, because she "knew he was there in spirit." (Tr. at 166-67). Others recognized the bond that they shared. Roger Helms testified that, just about every time he and Faull spoke, Faull would brag about his daughter, talking about "how smart she was and how much smarter she was than him." (Tr. at 71).

Amber Eileen testified that she has had serious problems dealing with her father's murder. The grief and anxiety she suffered led to insomnia and depression. (Tr. at 149). She would spontaneously break down in tears. (Tr. at 150). She testified that she felt "overwhelmed" by the violent nature of her father's death and by the constant reminders of it due to stories in the media, a result of McAfee's notoriety. (Tr. at 150). She began acting erratically, binge drinking

and having emotional breakdowns and panic attacks. (Tr. at 148, 162). About a year and a half after her father's death, her problems progressed to the point that her boyfriend confronted her about them. (Tr. at 148). Eventually, he convinced her to go to the college's health center for counseling. (Tr. at 149). Psychiatric treatment and medication have helped somewhat, but she remains anxious and fearful. (Tr. at 152-55, 171). She continues to have nightmares about her father's last moments. (Tr. at 159). She testified that she now feels a need to control everything around her because she "didn't have any control of ... that situation." (Tr. at 171). And the mental health challenges she continues to endure have led to physical problems, such as weight gain and intimacy issues. (Tr. at 156-57).

\* \* \*

The Estate presented evidence that $8,482.43 in funeral-related expenses had been incurred, primarily by Faull's mother and stepfather. (Doc. 134-53). The expenses included payments to newspapers for obituaries, the cost of a memorial service, and travel expenses required to make the arrangements and for family members to attend the service. (Doc. 134-53).

## IV. Conclusions of Law

Florida's Wrongful Death Act, Fla. Stat. §§ 768.16-768.26 (the "FWDA"), provides a right of action as follows:

> When the death of a person is caused by the wrongful act ... of any person ... and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person ... that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured.

Fla. Stat. § 768.19. The action is to be brought by the decedent's personal representative, who shall recover the damages specified in the FWDA for the benefit of the decedent's survivors and estate. Fla. Stat. § 768.20. Where, as here, the decedent does not have a surviving spouse, the

FWDA permits children of the decedent to recover damages "for lost parental companionship, instruction, and guidance and for the mental pain and suffering from the date of the injury." Fla. Stat. § 768.21(3). The decedent's personal representative may also recover, for the estate, medical or funeral expenses due to the decedent's injury or death that have become a charge against the estate or that were paid by or on behalf of the decedent. Fla. Stat. § 768.21(6). In addition, when one or more of the elements of compensatory damages that are recoverable under Section 768.21 of the FWDA are established, punitive damages may be recovered. *Martin v. United Sec. Services, Inc.*, 314 So. 2d 765, 772 (Fla. 1975).

### A. Compensatory Damages

The Estate seeks to recover two categories of compensatory damages: the $8,482.43 in funeral-related expenses pursuant to Fla. Stat. 768.21(6) and $5 million in non-economic damages for the harm suffered by his daughter, Amber Eileen, pursuant to Fla. Stat. 768.21(3). The funeral-related expenses are well-supported in the record (Doc. 134-53) and the Estate is clearly entitled to receive them. The issue of the noneconomic harm suffered by Amber Eileen, however, is not so cut-and-dried.

As the Estate notes in its trial brief, in cases such as these the factfinder is "asked to place a dollar amount on suffering," an inherently subjective task. *See Myers v. Central Fla. Investments, Inc.*, 592 F.3d. 1201, 1213 (11th Cir. 2010). The only things even resembling objective criteria for translating things such as emotional harm and lost companionship into a dollar amount are the damages awards made by factfinders in similar cases. The cases submitted by the Estate support the compensatory damages award it seeks here on behalf of Amber Eileen.

In *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268 (Fla. 2018), for example, the Florida Supreme Court reinstated the trial court's $4.5 million non-economic damages award,

which had been vacated as excessive by the Fourth District Court of Appeal. In that case, an adult child whose mother died of lung cancer was awarded $6 million in noneconomic damages, though a jury finding of 25 percent fault on the mother's part resulted in the award being reduced to $4.5 million. *Id.* at 273. The mother was 58 when she died, and the daughter was 42, and the evidence established a "very close and unique" relationship between them, more like one between sisters than between parent and adult child. *Id.* at 271-72.

The evidence here established that the relationship between Amber Eileen and her father was also a close one, though not so close as the relationship at issue in *Odom*. Thus, everything else being equal, one would expect that the harm suffered by Amber Eileen would have been somewhat less profound than the harm suffered by the plaintiff in *Odom* and would not support quite so large an award of damages. And indeed, the amount sought here for the loss of that relationship, and the resulting pain and suffering – $5 million – is substantially less than the amount awarded in *Odom*, which was $6 million (though subsequently reduced on the basis of comparative fault). In addition, Gregory Faull was only 52 when he died, meaning that his relationship with his daughter would have been expected to continue six years longer than the relationship at issue in *Odom*. Taking all of this into consideration, the Court finds that the *Odom* case supports the award of damages sought here. Therefore, $5 million will be awarded in noneconomic damages, along with the award of $8,482.43 for funeral expenses.

### B. Punitive Damages

In addition to the compensatory damages of just over $5 million set forth above, the Estate seeks to recover $35 million in punitive damages.

Punitive damages are not intended to further compensate the victim, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future. *Myers* 592 F.3d at 1216. The United States Supreme Court has stated that a review of a punitive damages award must include consideration of three guideposts to determine whether the award is unconstitutionally excessive:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). The Estate points out, in regard to the third guidepost, that the penalties for premeditated murder include the death penalty (Doc. 128 at 11) but does not discuss civil penalties that might be authorized in similar cases. Therefore, the Court will not consider that guidepost here.[7] The remaining guideposts will be considered in turn.

1. Reprehensibility

The Supreme Court has described the first guidepost – the degree of reprehensibility of the defendant's conduct – as "the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. In assessing that degree of reprehensibility, courts are to consider (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of

---

[7] Similarly, the Court notes that the record in this case is essentially devoid of evidence regarding McAfee's current net worth. Given that the Defendant chose not to avail himself of the opportunity to present evidence regarding his ability to pay, the Court has not taken this issue into consideration in setting the amount of punitive damages to be awarded.

the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576–77, 116 S.Ct. 1589.

It goes without saying that our society considers the acts at issue here – torture and murder – to be the most horrific that one person can inflict upon another. The first, second, and fifth factors set forth in *Gore* all support the imposition of punitive damages, as the harm was physical rather than economic, it showed not merely indifference to the health of another but an intent to end the life of another, and it was the result of intentional malice. The third and fourth factors – *i.e.*, financial vulnerability and repetition of conduct – are not present in this case,[8] but the undersigned sees no way in which their absence diminishes the reprehensibility of the Defendant's conduct to any meaningful degree.

### 2. Disparity

The ratio between the amount of exemplary damages awarded and the actual or potential harm inflicted on the plaintiff is "perhaps the most commonly cited indicium of an unreasonable or excessive punitive damages award." *Id.*, at 580, 116 S.Ct. 1589. The Supreme Court has said that it cannot establish a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Pacific Mut. Life Ins. Co. v. Haslip*, 499

---

[8] In the Third Amended Complaint, the Estate asserted that in an earlier incident on Belize, McAfee ordered some thugs to assault a local resident who had threatened him. (Doc. 104 at 3-4). The victim subsequently died as a result of the beating, though likely as an "unintended consequence" of it. (Doc. 104 at 4). In its trial brief, the Estate argued that this earlier murder should be taken into consideration with regard to the fourth factor, repetition of conduct. However, the circumstances of this earlier killing, while horrifying, are far less horrific than the circumstances here – primarily in that, as the Estate asserts, the earlier death was likely unintentional. Accordingly, the undersigned does not find that the earlier incident is properly considered in connection with assessment of the degree of reprehensibility of the acts in this case.

U.S. 1, 18, 111 S.Ct. 1032, 1043 113 L.Ed. 2d 1 (1991). However, the Supreme Court has suggested that, in cases where the underlying compensatory damages award is substantial, a punitive damages award of more than four times the amount of compensatory damages "might be close to the line of constitutional impropriety." *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524 (citing cases). Although the Estate cited cases in which awards exceeding this ratio were subsequently upheld, Doc. 128 at 9, the Court finds that a $20 million punitive damages award is sufficient to punish McAfee for his misconduct and deter further such action in the future. This results in roughly a 4-to-1 ratio between the exemplary damages and the compensatory damages in this case.

## V. Conclusion

In consideration of the foregoing, it is hereby **ORDERED** that the Clerk shall enter judgment in favor of the Estate and against the Defendant John McAfee on the Estate's claim under the Florida Wrongful Death Act for

1. $8,482.43 in funeral expenses per Fla. Stat. § 768.21(6);

2. $5 million in noneconomic damages per Fla. Stat. § 768.21(3); and

3. $20 million in punitive damages.

**DONE and ORDERED** in Chambers, Orlando, Florida on March 19, 2019.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE